Okay, our first case is Abreu v. Superintendent Smithfield SCI, number 17-2442. Ms. Stavroulakis, can you hear us? I can. Can you hear me as well? I can. I believe Council for the Commonwealth can as well. So just to start, and this isn't coming off your time, but we received word yesterday that Mr. Abreu has been removed from the country. We will not talk about that today. What we would ask, though, is that Council in this case meet and confer so the Commonwealth has a better idea of what happened here, and then we'll send along an order laying out a briefing schedule on the ramifications of his removal from the country. But for today, and I hope the clerk told you this as well, we're just going to go forward with the case as briefed. Okay? So with that said, you may proceed. All right. Diana Stavroulakis for Mario Abreu, and I would like to reserve five minutes for rebuttal, if I may. That will be granted. And today we're focusing on trial counsel's ineffective assistance in failing to object to the introduction of grand jury testimony from two of Abreu's co-conspirators, Mr. Willard and Mr. Hoffman, and also in failing to strike the testimony of Agent Jordan, who relied on that hearsay information from Willard and Hoffman, who did not testify at trial. The admission of that information violated both the confrontation clause. It was also not admissible under any separate rule of Pennsylvania rules of evidence. So we look to the reasonableness of why trial counsel wouldn't have objected in this scenario. And being that the court below is a court of record, I reviewed the trial court, and we see from the very beginning that trial counsel did have an objection and an ongoing renewed objection to the fact that Agent Jordan testified throughout to the hearsay he received from Willard and Hoffman. And so we know by the fact that trial counsel objected all along that he realized this information was inadmissible. But doesn't that, though, counsel perhaps show that this was a tactical decision on counsel's part? Objecting, I think, shows that he realized it was inadmissible. Changing his mind later and then determining that these witnesses were unavailable, I'm assessing that based on, you know, what could the possible reason be. I have the government suggesting that he preferred the dry reading of the grand jury testimony because you don't have a live witness and it comes across differently for the jury. Well, earlier in the trial, didn't the government grant immunity to someone who did testify? And perhaps counsel saw that and said, hey, dry read, way better. That's an important point, but that was Nathan Schmidt. That was at the beginning of the trial, and I would say if the attorney general's office was going to also grant immunity to Mr. Hoffman and Willard, they could have done that at that time. They didn't at any time. They didn't farther along when it became apparent there may be a problem with them testifying. They also didn't grant immunity when they were called to the stand. Is there anything in the record that suggests that they would have accepted the immunity offer? I don't have anything in the record that I recall that says that, but my point of this is that it's different when someone testifies and the jury now knows they've been granted immunity and they're getting some deal or some type of something in exchange for the fact that they're offering testimony. By just dry reading in the grand jury testimony without explaining to the jury they may be getting something in return, I think that's prejudicial to Mr. Abreu. So it comes across to the jury in a different way. If they were there and they could have been cross-examined, they would have explained the benefit they were receiving from the immunity. So is your argument that there was nothing on the record in front of the jury to suggest their testimony may have been compromised with a deal or immunity or anything like that? For Nathan Schmidt there was, for sure. I don't recall that coming across to you. With respect to Hoffman's testimony, Mr. Hoffman's testimony, was there anything on the record to suggest that there was a quid pro quo in exchange for this testimony that was presented to the jury? I'm not recalling that at this time. I know that at one point the trial counsel then was able to bring up other parts of the grand jury testimony and also get that into the record as well as the parts that had been decided upon between the attorney general and defense counsel, and perhaps that's what you're questioning about. But I still believe that the importance of if the attorney general wanted to bring these guys in and give them immunity, they would have done so. I'm sorry. Sorry. I don't know if you have something else you want to finish up on that point, but I do want to ask you, your claim here is both about Hoffman and Willard's own testimony and about Agent Jordan's recounting of their statements, but the way I read it, each time the government's counsel was asking Agent Jordan about these things, it was about could you, this is not for the truth of the matter asserted, but for explaining why you took these certain actions. So why would that be problematic? Were Hoffman and Willard really witnesses there if it was just being used to kind of explain what Jordan was doing? Setting aside the time when they read in the grand jury testimony, that's clearly for the truth of what they said. Right. But I think what Agent Jordan did was beyond just saying based on information I received, I took further action. Can you show me where in the transcript, where in the record is Agent Jordan going beyond that, apart from the time he reads in their statements? At the very beginning of trial when he starts to testify, he explains to the court that through talking with Hoffman and Willard, they explained to him how they brought in the drugs, how they divided the drugs, how it was set out and given to other people, essentially the entire scheme. This was a large scale drug operation. Agent Jordan. I'm sorry, ma'am. If you're not aware of a specific page, it's fine to say so. Maybe you could follow up with the court if you don't have a specific citation, but we'd like to examine this for ourselves. I do have that. And I apologize. I had it set out, the exact page where he does that and where I have it in the appendix. But if I could, I would like to address that with the court afterward. If I could just submit something and point to exactly the paragraph I'm thinking about in my head is where he just lays out the entire scheme and the entire operation of this drug activity that went on. Okay. Can I ask you a question? It seems that we're doing perhaps some speculating about what was in counsel's head. Does it make sense to send this back for an evidentiary hearing to call counsel and find out, as they say, from the horse's mouth? I think that is important. Well, are you saying yes, that that is something you would favor? That is something I'd favor. It's something that Mr. Abreu requested in his federal habeas. Can you tell us where that is? Because I couldn't find it. Maybe I didn't actually see it, but that was another question I had. Do you have a cite for that? Appendix page 248, Abreu requests an evidentiary hearing, a new trial, or the sentence be vacated. But that was in his pro se papers, right? That was in his pro se papers. He was pro se before the district court. That's correct. And something else was filed, obviously, right, by counseled papers, right? I mean, I just didn't see where counsel followed up with a request for hearing, but I don't know. In the district court, he was not represented by counsel. Yeah. Okay. So you think that might be a possible solution here? I think it's a possible solution in that Mr. Denecke, he can explain his rationale for why he changed his mind. And I understand that we're speculating that we feel that maybe he did that because it would have limited the impact and it's different if you're reading something into the record versus having, you know, a live witness. But the problem here is the confrontation clause and that the grand jury testimony was never tested. We don't know the reliability of it because he was never given the opportunity to cross-examine, which I think is obviously very important. So let me circle back to a question I asked you earlier. So you had the grand jury testimony read to the jury. Was there any suggestion in the reading to the jury that this testimony would have been immunized, that this individual had a prior record, if any? Was the grand jury testimony tested at all? The grand jury testimony was not tested by defense counsel or by Mr. Abreu himself. You're asking me specifically about Mr. Denecke. I'm asking you the prejudice, ma'am. What prejudice do you have in light of the fact that it was read into the jury? It was read into the jury, his side of the situation and some drug buys that he had with Mr. Abreu. So if you would like a specific point for me to point to, I can do that after court today. I can include or submit something to the court to point precisely to that. I guess my question is, was it prejudicial that the jury was not told that there was a possible immunity deal out there? Was it prejudicial that the jury was never told what, if any, sort of incentive this individual would have had to testify? I think that's the entire point of it. It's that they're just given his testimony and they're never told anything other than that. So there's no opportunity to say what benefit they were getting out of it. That becomes problematic. So the jury is not just hearing what they have to say but not why they said it. And I apologize if I did not make that clear earlier. Maybe you could. You only have a few seconds left. So maybe on rebuttal, I mean, I'd be interested in prejudice generally. I mean, it seemed like there were a lot of witnesses and a lot of evidence. Sure, there's some disputed stuff here, but was it really prejudicial? I think, obviously, we are looking to see what the prejudice was and if the overall outcome affected the jury verdict. I just want to point out that Mr. Abreu faced 22 charges. So it's not a case where there's just one or two charges, guilty, not guilty. So we have many witnesses that the government brought in, but a lot of them connected back to other people in this drug scheme. Some of them went back to Ricky Ricardo. Some of them went back to Mr. Peralta. So I think when you exclude Hoffman and Willard's testimony and take those people out as a connection from Abreu to these other people, then maybe this scheme does not include these other people who are peripheral. They may have come back with a jury decision that did not find him guilty of all 22 counts. That is important because he ultimately was sentenced to 27 to 54 years. So I'm not looking at it as all or nothing, but the outcome could have been more beneficial to him if they couldn't establish a direct connection from Abreu to these other people who may have just been connected with Peralta or Ricardo. All right, Counsel, we'll get you on rebuttal. Thank you. Thank you. Good morning, Your Honors. Good morning. May it please the Court, Hugh Burns of the Commonwealth. Counsel, performance was not deficient. The choice before counsel was not whether to exclude Hoffman and Willard's evidence, but what form it would take. The evidence is going to come in regardless. Suppose they had not accepted the immunity offer and were willing to take a contempt hit. I think that's what Strickland calls the distorting effects of hindsight. I think the possibility of these witnesses saying, yeah, I'd like another year in jail by the end of that. We're speculating, right? I don't think it's speculation. Where is it on the record? It's in the statute. Where is it on the record? The statute is. No, no, no. So where is it on the record where the witness was offered immunity and he declined it or accepted it? That's not on the record because that was counsel's choice to make. How do we know that without a hearing? We normally have a hearing if we think maybe it was tactical, maybe there was a judgment it was better off. But you are taking the position we don't even need a hearing to know this. Well, two things. First, there was never a proffer from the petitioner that he would produce evidence that these witnesses would have been willing to fall on their swords in order to protect him. If they were willing to fall on their swords to do that, they wouldn't have testified to the grand jury. Second, we have the traverse in which Obrego himself says it would have been an easy thing for the prosecution to give these two witnesses immunity and have them testify in person. He's just speculating because there's nothing on the record suggesting they would have accepted the immunity. When the petitioner speculates that this event would have taken place and would have been a reason for allowing the grand jury testimony. Maybe we can clear the ground here. There are two questions on this, Strickland. The first is, would they in fact have testified? And the second is, or gotten immunity? And the second is, did counsel reasonably make a judgment that they would have and it was in his client's interest? Setting aside the statute, can you point to anything in the record that says in fact they would have testified or gotten immunity or that counsel made a judgment to that effect? You've mentioned the litigation position taken in the traverse. I'm not sure how much weight we give that, but what else? Well, all I can say, Your Honor, is it's the petitioner's burden to prove that. It's not the burden of the respondents to disprove it. If the record shows that there's a statute under which the witness would have been given immunity. I'm sorry. My understanding of the habeas statute is that if the petitioner makes out a non-frivolous claim, the district court then grants a hearing on this, and the petitioner doesn't have to come in with enough evidence to bear a burden before getting the hearing. I think the standard is that if the petitioner wants a hearing, the petitioner has to proffer evidence that he will produce in order to obtain the hearing. The petitioner doesn't just get to set out a scenario and... What's your citation for that? What authority are you relying on here? I think there are some cases cited in our brief in one of the footnotes. I'd be happy to recite them in a memorandum following the argument. You're welcome to. Maybe we can narrow the area of disagreement. You're now taking this position that they didn't need a burden even to get a hearing based on that they would have gotten immunity. Can we clear the ground about what the role of Willard and Hoffman's testimony was in the overall scheme? There are 22 counts here. Sentences on counts one through five are consecutive, so these matter. We have to figure out which witnesses go with which counts. Am I right that count one looks like it hangs on Deasy Cortez, Edward Cordes, Mary Beth Alvarez, not hanging on Hoffman and Willard? This is the 1999-2002 count. Well, to begin with, I'm not sure I agree with the premise of Your Honor's question that it's broken down by count. The only claim of prejudice in the brief, at least, that's been raised by Breyer is that Willard and Hoffman established that he was a large-scale drug dealer. Well, there were a dozen witnesses, apart from them, all of whom were presented for the purpose of establishing that a drug dealer was a large-scale drug dealer. I'm the judge. Grant me my premise. Yes, Your Honor. It's a good idea to grant the judge the premise of the question and not to fight the judge's premise. Now, count two. Count two is about 100 to 1,000 grams of cocaine from April to June 2002. My read is this count depends on Willard's testimony. It looks to me like Daisy and Edward Cortez's volume was too little. It looks like Alvarez's quantity was too little. Schmidt buys more, but Schmidt is very vague about dates and is spreading over several years. Do you grant that it looks like Willard's testimony is the foundation of the count two conviction? I would have to go back and look at count three. You're not aware of the record. Have you studied the record enough to talk to me about count three? Apparently not, Your Honor. Okay. Next time, please do. Thank you, Your Honor. Let me ask you a question. Is there any significance to the fact that Abreu represented himself for the first two and a half days of trial and then went to counsel? I don't think so. I think that all of the claims that are presented here are based on events that happened after Abreu was no longer representing himself. Schmidt, for example, was the first witness to testify, and he was granted immunity, and that happened after Abreu stopped representing himself. The witness who testified before that was Jaden Jordan. So, no, I don't think that that has any significance. What has significance, I think, is the fact that, one, the record shows that counsel discussed the matter with opposing counsel and thought about it before deciding to allow the grand jury testimony to be read. Secondly, Abreu said in his traverse that it would have been a simple matter for the witnesses who had been granted immunity and thus present it live, and it was a choice for counsel to make. The case law, Strickland itself says, after counsel has made a reasonable investigation of the situation, that such choices are virtually unchallengeable. So is it reasonable? In this case, the closing argument for the prosecutor is about 22 pages. In those 22 pages, there were 19 references to Hoffman's unchallenged grand jury testimony. Is that a reasonable choice to have made? It's a reasonable choice because the evidence is going to come in regardless. Under the statute, the prosecution had the ability to give the witnesses immunity, and that's something Abreu admitted in his traverse. There's nothing on the record that suggests they would have accepted that. Moreover, the jury was never told this was immunized testimony. That was counsel's call to make, especially in light of the fact that the witnesses would have been risking an additional year in prison. And so that's a reasonable position to take. If you're defense counsel, I'm going to allow the grand jury testimony to be read to the jury. I'm not going to tell the jury the jury's not going to find out that there was immunized testimony or any quid pro quo, and then the government argues it 19 times in their closing? Your Honor, you're talking about a quid pro quo. There's no evidence of a quid pro quo in this case. Well, immunity would have been a quid pro quo, right? If you had immunized the witnesses. No, immunity would have been forcing the witnesses to take the stand against their will. It would have removed their Fifth Amendment right to refuse the testimony. That's the only purpose of granting them immunity. It's not a quid pro quo. They don't get anything out of it. All they get to do is testify. Would they have been prosecuted for their testimony and incriminating themselves? Under the statute, if they refuse to testify after being granted immunity, they could be sentenced to an additional year in prison. And therefore, I think it would be a vanishingly slight remote possibility to say that one or both of these witnesses might have said, yeah, another year in jail, that sounds fine to me. I'm not going to testify. Even though they had already testified in front of the grand jury. If they were going to fall on their swords, that would have been the time to do it. When they testify in front of a jury and admit to a whole bunch of criminal conduct, should the jury be told that there was immunity in exchange for that testimony? There was no immunity in exchange for the testimony in the sense that they were going to be relieved of the consequences of their criminal conduct. How do we know that? How do we know that? The only point of a grant of immunity at the trial would be to remove their Fifth Amendment right to refuse to testify and thereby enable the court to order them to get on the stand and testify. And enable defense counsel to cross-examine them on whether or not they were offered anything in exchange for their testimony, right? That is not something in exchange for the testimony. They're not getting anything out of that. They don't gain any advantage by being given immunity for their testimony. All it does is eliminate the possibility of an additional penalty for refusing to testify. So there's no quid pro quo. There's nothing that the witnesses gain by getting immunity in order to get them on the witness stand. All it gets them to do is reiterate what they already told the grand jury. And that's one reason why there's no prejudice, in addition to the fact that all the other witnesses testified to the same scheme. All the other witnesses testified to the fact that all these drug transactions included controlled buys. But there was nobody the government relied on more than Mr. Hoffman. They wrote him throughout the entire closing argument. Hoffman was very heavily involved in the scheme. But other witnesses referred to and testified to Hoffman's activities. Was Hoffman charged? I believe he was. Was the jury told this? No, I don't think that the jury was necessarily told that he was charged. Had he testified, would they have been with competent defense counsel to cross-examine him on this? With the fact that he was charged and convicted, perhaps, and given a criminal penalty for his own conduct? Yeah, but I don't see how that's a cross-examination. I don't see how that impeaches the witness to say that you were part of a big drug operation and you got a criminal hit for it. Naturally, you would. As opposed to just read the testimony and let the jury speculate that maybe nothing happened to this guy. That would have been to the advantage of the defendant if they had drawn that kind of an inference. We don't know what inference they drew. No, we don't. But if the speculation is that maybe the jury drew an inference that they got no penalty, that would have been an impeaching inference. All right, so what about sending it back to have an evidentiary hearing and hear from counsel? Well, I think that that should not be done for the simple reason that there was never any proverb about what counsel would say. I think that's part of the burden on the petitioner's part in pleading and saying that my counsel had no reasonable basis for what he was doing to say here's a statement from counsel, here's my proffer of what counsel would testify to if I were granted a hearing. All there was was a general request for a hearing. There was never any specific proffer about what evidence would be produced should a hearing take place. And under those circumstances, I think any district court judge would refuse to grant a hearing because a hearing on what? I want to get to the second issue. I just want to mention that it was never raised as a separate claim in the Habeas petition. And that's why it wasn't addressed by the district court. By the way, if we get to the merits of that, you know, by the time the trial ended, even though counsel had objected to Jordan testifying about statements by Willard and Hoffman, by the end of the trial, those statements were in evidence. And so it wasn't hearsay anymore. Or to the extent it was, it was harmless because it was cumulative. The evidence was already before the jury. And the same prejudice argument applies. It's all the same ball of wax, as it were, because there were almost a dozen witnesses all testifying to this large-scale drug operation that, according to the defense claim, only Willard and Hoffman established. That wasn't true. That was established by all the other witnesses in addition to Willard and Hoffman. Thank you, Your Honors. Okay. Thank you, counsel. Counsel, we'll hear your rebuttal. I want to start off by saying that the assistant attorney general keeps referencing the fact that the second issue regarding Agent Jordan is waived, that it was not raised in the district court, that in the appendix, pages 269 to 292, Mr. Abreu did intertwine that argument with the main argument. The two arguments really go together because they involve introducing or testifying about the hearsay statements of Hoffman and Willard. So he did put it in there that this was impermissible and that he wanted to argue that fact. As far as the statement that there's a distorting effect of hindsight, I would agree to that, which is why my argument is based on what we see of record, which is trial counsel objecting all along, and then when that possibility comes to fruition, then it's abandoned. So I see that as unreasonable, and unless he's brought in to explain why that is reasonable, we don't know other than going by what we see of the record. I'm saying that it is unreasonable because if they were going to be given immunity, Willard and Hoffman, he could have forced that. And if he forced them to get immunity, then the jury would have heard the testimony knowing that they were getting immunity. That's a whole different thing than just reading in grand jury testimony that's not cross-examined and the jury doesn't know whether they're getting anything in exchange for that or how that affects the overall scheme. I do think it's important that, although the government did call many other witnesses, that they don't all rise to the level of Hoffman and Willard, who seem to have been closer to a brewer at the top of the scheme or as the connection between these other people. So if you remove their testimony and you're left with just the remaining individuals, the outcome of the case would have been different. So, again, we're asking at least for the remand for an evidentiary hearing, but we are asking for a new trial based on the constitutional violation, the ineffectiveness of trial counsel, and for the violation of the Confrontation Clause. Ms. Stavroulakis, what's your response to Mr. Burns' insistence that your client didn't bear the burden of proffering enough information to get an evidentiary hearing? I think my client, first of all, did the best with what he had when he got to the federal court level. He had originally raised these issues in the PCRA process, which were completely ignored by his post-conviction counsel. But when he got to federal court, he does lay out, by citing in the record, where trial counsel had objected and why was that abandoned later. So although he doesn't have a statement from trial counsel, I think the argument is he's not going to be able to explain that. If you know the citation, could you tell it to us now? And if not, could you follow up with it where you would point to to say that this was adequately developed and pled to trigger an evidentiary hearing? Are you aware of where to direct us now? If you're not, you can follow up with that. In the federal habeas? Yeah. Okay. I have marked appendix 269 to 292. So, and again, in the objections to the court's, the magistrate judge's report and recommendation, the appendix 408 to 409. So I have pointed those aspects out because that's when he addresses the fact that Agent Jordan was allowed to go on and discuss the hearsay statements given by Hoffman and Willard. But I can also follow up with that as well. I'm not saying that I wouldn't do that as well. I should caution, actually, both counsel. We're happy to get specific record sites, but that's not an invitation to rebrief this case, okay? Understood. Do you have anything more, counsel? That's it. Once again, asking for, at the very least, an evidentiary hearing, a remand for that, or an outright new trial for Mr. Abreu. Thank you. Just to make clear, we'd like counsel to talk by the end of the week, just so the Commonwealth has an idea of exactly what the circumstances were as to your client's removal from the country. And it's fair to the Commonwealth then, too, so they can do their research. We'll send out something, some sort of briefing schedule on that issue shortly, but it would be good to kick off that way so they can start their research, okay? Thank you, counsel, for your excellent briefing and argument, and we'll take the case under advisement. Thank you. Thank you very much.